*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 13-CO-102 & 13-CO-225

TRAVIS HANEY, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-5789-08)

(Hon. Ronna Lee Beck, Trial Judge)

(Argued December 2, 2014                    Decided July 23, 2015)

*Mikel-Meredith Weidman*, Public Defender Service, with whom *James Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*John Cummings*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Jennifer Kerkhoff*, *Jason Park*, and *William B. Wiegand*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and REID, *Senior Judge*.

REID, *Senior Judge*: While this court's consideration of appellant Travis

Haney's direct appeal was pending,[1] he filed a motion in the trial court claiming ineffective assistance of counsel, under D.C. Code § 23-110 (2012 Repl.), in part because his trial counsel failed to file a motion to suppress the videotaped statement he made to a police detective. Following an evidentiary hearing, the trial court found that Mr. Haney's trial counsel's performance was constitutionally deficient because he did not "appreciate that there was a basis for suppressing a portion of [Mr. Haney's] statement."[2] Nevertheless, the court concluded that there was no reasonable probability that the outcome of Mr. Haney's trial would have been different had his trial counsel filed the motion to suppress.[3] Mr. Haney raises several arguments about the trial court's disposition of his D.C. Code § 23-110 motion. We consider only one of his arguments – the trial court incorrectly concluded that there is no reasonable probability that the outcome of his trial would

---

[1] In his direct appeal, this court affirmed the judgment on appeal, except that we vacated one of Mr. Haney's convictions for possession of a firearm during a crime of violence. *Haney v. United States*, 41 A.3d 1227 (D.C. 2012) (*Haney I*).

[2] The trial court stated in full, "I find it a failure to appreciate that there was a basis for suppressing the portion of defendant's statement that the government planned to introduce combined with his apparent judgment that the defendant would be better off if the portion of the statement was suppressed was deficient performance."

[3] The trial court rejected Mr. Haney's other contentions.

have been different if his counsel had filed the motion to suppress. For the following reasons, we reverse the trial court's judgment, and we remand this case for a new trial.[4]

## FACTUAL SUMMARY

The government charged Mr. Haney with several criminal offenses relating to the shooting of Phyllis Walters in the Southwest quadrant of the District of Columbia; Ms. Walters was shot nine times on March 10, 2008. *Haney I*, *supra*, 41 A.3d at 1229. On March 12, 2008, Metropolitan Police Department Detective Stanley Greene interrogated Mr. Haney about the shooting; the interrogation was videotaped. Detective Greene informed Mr. Haney that he had been "locked up for assault with intent to kill." After Mr. Haney answered certain booking questions, Detective Greene announced that he had to read Mr. Haney his rights. Mr. Haney inquired, "I don't need no lawyer or nothing?" Detective Greene replied, "It's up to you." Mr. Haney read the front of the rights card himself, including the sentence

---

[4] In light of our disposition of this matter, we see no need to consider the trial court's denial of Mr. Haney's "motion to correct and supplement record and reconsider." That order pertains to an issue which we do not discuss in this opinion.

stating, "If you want to answer questions now without a lawyer present you will still have the right to stop answering at any time." Before Mr. Haney proceeded to the questions on the back side of the rights card, Detective Greene explained, "So, . . . any time if you answered yes to all the questions, and we get to a point where you don't want to answer a question, you can go, man I don't want to talk about that." Mr. Haney responded, "Yes" to all of the questions and Detective Greene began the interrogation.

Mr. Haney acknowledged that he knew Ms. Walters and described her as "like a godmother." While he was helping his mother move from one house to another, his mother informed him that Ms. Walters had been shot. Mr. Haney repeatedly told Detective Greene that he had nothing to do with Ms. Walters's shooting, even when Detective Greene told him that he received a report (not from Ms. Walters) that Mr. Haney shot Ms. Walters. After Detective Greene stated that before Mr. Haney "put the mask on, people saw you," Mr. Haney asserted, "Nah, don't say before you put the mask on. Before whoever shot the girl put the mask on." The interrogation continued along these lines, with Detective Greene making certain accusations against Mr. Haney, including those concerning an incident during which Mr. Haney allegedly confronted and pulled a gun on another woman, and an allegation that Mr. Haney allegedly possessed a .22 gun. In response, Mr. Haney

insisted, often with profanity, that he had nothing to do with the shooting of Ms. Walters.

After about one and one half hours of interrogation, Mr. Haney indicated that he did not want to answer any more questions, but Detective Greene continued the interrogation. Subsequently, Mr. Haney made statements that were introduced at his trial. Detective Greene broached the question of whether Mr. Haney knew how much time he could get for shooting Ms. Walters, and said, "we got who shot her." Mr. Haney replied, in part, "Man, y'all got who shot her. You right. You right. You right, I don't even want to answer no more questions, since y'all got who shot her. You right." After another question from Detective Greene, Mr. Haney again declared that he did not pull a gun on Ms. Walters. The questioning continued and Mr. Haney eventually told Detective Greene that he had "a baby on the way" and didn't have time to kill. Detective Greene focused on the baby, and Mr. Haney not only again denied involvement in the shooting of Ms. Walters, but also reiterated, "I don't even want to answer no more questions, Joe. I don't want to answer no more questions."

Detective Greene proceeded with his discussion of the baby, but soon declared that Ms. Walters was "terrified to death lately with [Mr. Haney]." Mr.

Haney responded with profanity, saying he had been giving "this bi\*\*h change," and he cursed Ms. Walters and concluded with the statement, "I [Mr. Haney] probably look like the [person] she snitched on before, that's what." He went on, making clear that his reference was to his friend, "Deangelo Foote," and that he thought she had implicated his friend in a homicide. As Mr. Haney put it, "I don't know what this bi\*\*h do, I know she told something. When I went to court with my man for a homicide, I know she said something." Mr. Haney persisted, "Scared of me, cause I look like, just like my man, . . . and I knew that's why this bi\*\*h scared. Every time I see her, I can see it in her eyes. Like, yeah, bi\*\*h I know you told something. Yeah." In response to Detective Greene's question, "which homicide?", Mr. Haney said, "Deangelo Foote. It - - it wasn't even no homicide, he, he shot somebody up on P Street." Detective Greene continued to press his message that "people" were saying that Mr. Haney shot Ms. Walters. Mr. Haney expressed criticism of persons who "snitched"; he admitted being "on weed," and exclaimed that he was not going to snitch on himself. The interrogation continued. Eventually Detective Greene suggested that other things "might be coming down the pipe" in which Mr. Haney would be implicated, and the detective also focused on the fact that it would be the first time Mr. Haney would be incarcerated for committing a crime – the shooting of Ms. Walters. Mr. Haney again maintained that he did not shoot Ms. Walters.

During his first trial, the trial court declared a mistrial because the jury could not reach a unanimous verdict. At his second trial, the jury convicted Mr. Haney on some of the charges against him, including assault with intent to kill. However, he was acquitted of two obstruction of justice counts and threatening to kidnap/injure a person.[5] *Haney I*, *supra*, 41 A.3d at 1230. Defense trial counsel did not seek a motion to suppress Mr. Haney's statements at either trial.

At the evidentiary hearing on Mr. Haney's § 23-110 motion, the prosecutor who tried the case indicated that the prosecution anticipated an evidentiary challenge to the admissibility of Mr. Haney's statement because halfway through his interrogation, Mr. Haney said, "I don't want to talk about it anymore, some words to that effect." She discussed the matter with Mr. Haney's trial counsel before the first and second trials. She informed defense counsel that she "intended to use only about a two, two and a half page portion" concerning Deangelo Foote,[6] and that

---

[5] One of the obstruction of justice counts related to whether the motive for the shooting of Ms. Walters was Ms. Walters' participation as a government witness in the trial of Mr. Haney's friend, Deangelo Foote.

[6] The excerpt, covering dialogue after Mr. Haney had twice declared that he did not want to answer any more questions, includes Detective Greene's assertion that Ms. Walters "is terrified to death lately with you." It also reveals Mr. Haney's

(continued…)

excerpt would only be admissible with respect to the obstruction of justice count that pertained to Mr. Foote, and further, the prosecutor would put in Mr. Haney's denials. However, if defense counsel chose to go into other matters that opened the door to her use of other portions of Mr. Haney's statements, she would feel free to use them. Other than the two or two and a half page excerpt, the prosecutor did not use any other portion of Mr. Haney's statements at trial.

Mr. Haney's trial counsel also testified during the hearing on the § 23-110 motion. He explained that he had hoped that the entire videotaped statement would be admitted into evidence because "it wasn't damaging and . . . it was in some ways somewhat favorable." He did not "recall specifically what thoughts [he] had" about "whether there were valid constitutional issues on which to have the statement suppressed." However, he decided to make an evidentiary challenge to parts of the statement in an effort to exclude some things, including Mr. Haney's use of the word "bi**h"; he considered admission of that word to be "highly prejudicial." After the first trial, counsel acknowledged that he did not "go back and identify any specific

---

(…continued)
profanity; his repeated reference to Ms. Walters as a "bi**h"; and his depiction of Ms. Walters as a snitch.

constitutional issues."

The trial court characterized defense counsel as "an experienced, competent lawyer" who "ably represented Mr. Haney in many respects." Nevertheless, the court concluded that, "[Defense counsel] never appreciated that there was a basis for suppressing a portion of [Mr. Haney's] statement," and he did not make a "calculation of deciding that the statement was more beneficial than it was harmful." After concluding that defense counsel's performance was constitutionally deficient, the trial court declared that there was no reasonable probability that the outcome of Mr. Haney's trial would have been different had defense counsel filed the motion to suppress.[7]

**ANALYSIS**

Mr. Haney contends that his "unsavory videotaped admissions, showcased in

---

[7] The government does not argue on appeal that a timely filed defense motion to suppress would have failed. Rather, the government contends, in part, "Even assuming trial counsel's performance was deficient, there is no reasonable probability that the verdict would have been different if trial counsel had moved to suppress [Mr. Haney's] statement."

the prosecution's opening statement, its case in chief, and then in its closing and rebuttal arguments, played an essential role in the government's case by offering critical support in the defendant's own words for the prosecution's motive theory that Mr. Haney shot [Ms.] Walters because she had 'snitched' on his good friend." He points to his repeated association of the word "bi**h" with Ms. Walters and his assertion that he could see fear of himself in her eyes. He argues that "without the Foote motive theory to bolster Ms. Walters's identification of [him] as the shooter, the government's case against him was extremely weak, as it depended exclusively on the testimony of [Ms.] Walters, whose truthfulness and reliability were questionable at best." Furthermore, he asserts that "[t]he trial judge was wrong to assume that [his] acquittal on the obstruction count relating to the Deangelo Foote prosecution signified that the government's motive theory had no substantial influence on the jury's verdict." He maintains that the acquittal on that count was "not a wholesale rejection of the motive theory." The government generally supports the trial court's findings and conclusions.

We review the trial court's "ultimate legal determination" *de novo*. *Kuhn v. United States*, 900 A.2d 691, 699 (D.C. 2006). Where we agree with the trial court's finding and conclusion that defense counsel rendered constitutionally deficient assistance of counsel, as here, we consider only whether counsel's

deficient performance prejudiced defendant's defense. In that regard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Cosio v. United States*, 927 A.2d 1106, 1132 (D.C. 2007) (en banc) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "[W]hat constitutes a 'reasonable probability' of a different outcome has to be measured by reference to 'the purpose of the defense [which] is to raise a reasonable doubt in the jurors' minds." *Young v. United States*, 56 A.3d 1184, 1200 (D.C. 2012) (citation omitted). Thus, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[8] *Cosio*, 927 A.2d at 1132 (citing *Strickland*, 466 U.S. at 695). Moreover, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (citing *Strickland*, 466 U.S. at 694).

The trial court examined "the harmful portions" of Mr. Haney's videotaped

---

[8] In *Rivas v. United States*, 783 A.2d 125 (D.C. 2001), this court said, "[t]he reasonable doubt standard of proof requires the factfinder 'to reach a subjective state of near certitude of the guilt of the accused.'" *Id*. at 133 (citing *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). "Proof of a fact beyond a reasonable doubt is thus 'more powerful' than proof that the fact is 'more likely true than not''; more powerful, even, than proof 'that its truth is highly probable.'" *Id*. (citation omitted).

statement. First, the court focused on the fact that the statement showed that Mr. Haney "knew Ms. Walters[,] [t]hat he knew her name and . . . saw her on the street," and "referred to her repeatedly as a bi**h in the statement." The court observed that there was other evidence that Mr. Haney knew Ms. Walters, including her testimony and Mr. Haney's own testimony after he waived his *Miranda* rights and before he invoked his right not to answer any more questions. As for Mr. Haney's use of the word bi**h in reference to Ms. Walters, the court indicated that there was other evidence of Mr. Haney's "hostility" toward Ms. Walters, "or the potential for hostility between Mr. Haney and Ms. Walters," including Ms. Walters's "reputation in the community as a snitch" and Mr. Haney's "reference to her having been a snitch."

Second, the trial court acknowledged that "there's no indication in the record that [Mr. Haney's] conviction that Ms. Walters had snitched on his close friend, [Deangelo Foote] could have been established except from [Mr. Haney's] statement." But, the trial court concluded that "snitching against [Mr.] Foote as a motive was not very plausible" because "[i]t had occurred two years before and [Mr. Haney] and Ms. Walters had seen each other many times in the interim without incident," and because the jury had acquitted Mr. Haney on the obstruction charge that related to Ms. Walters's snitching on Mr. Foote. The court summed up its view

of "the Foote motive" by saying, "I don't think the Foote motive was very significant in this trial."

Third, the trial court concentrated on the "statement about Ms. Walters being fearful of Mr. Haney" and the claim by the defense "that the fear statement strongly corroborated the government's theory that Mr. Haney was a killer who would act on his hatred of Ms. Walters." The court stated, "I just don't follow the logic of that. I think that argument to that affect is overblown and just doesn't make sense to me." The court characterized as "powerful" evidence Ms. Walters's identification of Mr. Haney as the person who shot her, since she "knew Mr. Haney well, she saw his face in broad daylight before he put the mask on, according to her and the jury credited her identification of him." The court described the testimony of government witness Raymond Crutchfield (that the shooter had a mask on before he emerged from the alley and he could not see his face) as not "very convincing because the message from Mr. Crutchfield from the beginning was that he did not want to get involved in incriminating anyone." Therefore, the court concluded, "I don't view Mr. Crutchfield's statement as something that's so compelling that Ms. Walters's … testimony in that regard should be rejected."

It is understandable that the trial judge, who presided over the first jury trial in

which the jury did not reach a verdict, and the second jury trial, would form views about the credibility of witnesses and the weight of the evidence. However, our case law instructs that when determining whether the defendant suffered prejudice as a result of his trial counsel's deficient performance, the proper focus is "whether there is a reasonable probability that, absent the errors [of defense counsel], the factfinder would have had a reasonable doubt respecting guilt." *Cosio*, *supra*, 927 A.2d at 1132 (citing *Srickland*, *supra*, 466 U.S. at 695). Thus, the proper question here is not whether the trial judge in a jury trial believes that Ms. Walters's "snitching against [Mr.] Foote as a motive was not very plausible" or "very significant"; or that the judge considered Ms. Walters's testimony to be "powerful" and Mr. Crutchfield's testimony not "very convincing." Rather, the proper question is whether, absent defense counsel's errors (here the failure to appreciate that a basis existed for suppressing Mr. Haney's videotaped statement), reasonable jurors, acting as factfinders in this case, "would have had a reasonable doubt respecting guilt," and hence, whether there is "a reasonable probability" that the outcome of Mr. Haney's second trial would have been different. *Id*.

As we examine the prejudice issue, we are mindful of what we reiterated in *Gathers v. United States*, 101 A.3d 1004 (D.C. 2014), "[a] prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about

whether the admission of the evidence was meant to be, and was, prejudicial." *Id*. at 1009 n.5 (citing *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004)). Here, the prosecutor opened her closing argument, and ended her rebuttal argument, with an unmistakable emphasis on Mr. Haney's words, uttered during his March 12, 2008, interrogation by Detective Greene; these words, admitted into evidence, highlighted Mr. Haney's alleged motive for shooting Ms. Walters. Although the trial judge dismissed the significance of this motive evidence because Mr. Haney was acquitted on the obstruction charge that related to Ms. Walters's implication of Mr. Foote in a homicide, we cannot speculate that Mr. Haney's words played no role in the jury's verdict of guilty as to the assault with intent to kill while armed charge.[9]

The prosecutor undoubtedly captured the attention of the jurors with the first two sentences of her closing argument that stressed Mr. Haney's alleged motive in shooting Ms. Walters:

> Kill All Rats, these are the words that are permanently

---

[9] The trial court also commented that the Foote incident happened two years earlier and there had been no earlier incident between Mr. Haney and Ms. Walters. However, reasonable jurors could conclude that the two years without incident would not matter if Mr. Haney's memory of Ms. Walters's informing on Mr. Foote had festered and grown more significant for him over time.

> marked on the defendant's arm,[10] and they aptly describe what he intended to do to Phyllis Walters, what he tried to do to her that day when he shot her nine times because she was a rat, in his words, because she had been a witness.
>
> She had come forward in a case and cooperated against his friend Deangelo Foote, because she had told the police about what he had done to her, and for that, Kill All Rats, and he almost succeeded.

The trial court described Mr. Haney's argument about the link between Ms. Walters's alleged fear of Mr. Haney and the government's motive theory as "overblown" and as an argument that "just doesn't make sense to me." The judge also concluded that there was evidence of Mr. Haney's hostility toward Ms. Walters other than his repeated reference to her as a bi**h in his videotaped statement. Yet, just before closing out her rebuttal argument by summarizing Ms. Walters's identification of Mr. Haney and counting off the nine shots into her body, the prosecutor not only emphasized Mr. Haney's alleged motive and his words, taken from the videotaped statement, about Ms. Walters's fear of Mr. Haney, but also included his use of the word bi**h in the same graphic sentence describing Ms.

---

[10] Mr. Haney had a prominent tattoo on his right forearm which bore the message, Kill All Rats. Ms. Walters did not mention the tattoo until five months after her shooting when the prosecutor asked her whether Mr. Haney had distinctive marks or tattoos.

Walters's fear of him:

> It's just a coincidence that he knows her as that bi**h who testified against his friend.   That's just a coincidence.
> It's just a coincidence that he also said, she's the one who's scared of me, yeah bi**h, I see it in your eyes.

Clearly, reasonable jurors might reasonably have had doubts about Mr. Haney's guilt, given questions raised at trial about Ms. Walters's credibility (including her past drug use, her failure to mention Mr. Haney's prominent "Kill All Rats" tattoo until the prosecutor asked her about any distinctive marks or tattoos Mr. Haney might have); Mr. Crutchfield's testimony (if believed by reasonable jurors) indicating that the shooter had on his mask when he emerged from the alley; and Ms. Walters's position as the only eyewitness who identified Mr. Haney as her shooter. Furthermore, despite having reasonable doubts about Mr. Haney's guilt, reasonable jurors might reasonably have decided to convict Mr. Haney because of the prosecutor's stress, during the beginning part of her closing argument and towards the end of her rebuttal argument, on Mr. Haney's words, taken from the videotaped statement.   Hence, on this record we hold that the trial court erred in concluding that there was no reasonable probability of a different outcome.

Accordingly, for the foregoing reasons, we reverse the judgment of the trial court and remand this case for a new trial.

*So ordered.*